**Douglas M. JONES, Plaintiff,**

v.

**CITY OF KEY WEST, FLORIDA and Richard Heyman, Defendants.**

**No. 85–499–CIV–MARCUS.**

United States District Court,
S.D. Florida.

Feb. 25, 1988.

David P. Karcher, Underwood, Gillis, Karcher & Valle, P.A., Miami, Fla., for plaintiff.

Michael T. Burke, Fleming, O'Bryan & Fleming, Ft. Lauderdale, Fla., for defendants.

## FINAL ORDER, FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

Those who won our independence believed ... that freedom to think as you will and to speak as you think are means indispensible to the discovery and spread of political truth; ... that public discussion is a political duty; and that this should be a fundamental principle of American government.... Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.[1]

THIS ACTION was brought by Plaintiff, Douglas M. Jones, a resident of Key West, Florida, alleging a violation of 42 U.S.C. § 1983. Specifically, Plaintiff contends that, shortly after being called to testify on

---

1. *Whitney v. California,* 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring) (footnote omitted).

the issue of senior citizen discounts on garbage and sewer fees, he was unlawfully prevented from presenting his views at a public meeting of the City Commission of Key West by the Mayor of Key West, Richard Heyman acting under color of state law. Mr. Jones was silenced, removed from the City Commission Chambers by force pursuant to the Mayor's order, taken into custody, and arrested. He claims that these actions violated his rights under the First and Fourteenth Amendments to the United States Constitution and seeks injunctive and declaratory relief against the City of Key West, as well as damages.

Count I seeks to permanently enjoin the City of Key West and its Mayor from enforcing Key West City Ordinance No. 85–1. Plaintiff contends that the ordinance is unconstitutionally vague and overbroad, lacking "precise, objective, and narrowly pinpointed standards controlling the presiding officer's or a majority of the City Commissioners' exercise of discretion in their determination as to what speech shall constitute a disturbance." [Complaint ¶ 13(d)].

Count II claims damages against the City of Key West and Richard Heyman. Plaintiff asserts that the Defendants' actions violated his First Amendment rights as well as his rights under the due process and equal protection clauses of the Fourteenth Amendment. Plaintiff seeks compensatory damages for his injuries under 42 U.S.C. § 1983. He maintains that his removal from the City Commission Chambers and subsequent arrest caused him to suffer "embarrassment, public humiliation, emotional distress, mental pain and suffering, and injury to his reputation." [Complaint ¶ 20]. Additionally Plaintiff seeks punitive damages, claiming that the actions of Defendant Heyman were "willful, wanton, malicious and committed with complete disregard for the rights of the Plaintiff and others similarly situated." [Complaint ¶ 22]. Plaintiff also seeks costs, reasonable attorney's fees and such other relief as the Court may deem equitable and just.

Mr. Jones' Complaint was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. The Plaintiff, Douglas M. Jones is currently, and was at all times relevant to this action a resident of Key West, Florida. He operates a fumigating company in Key West.

2. On the day of February 5, 1985, a City Commission meeting was convened. The Defendant, Richard A. Heyman, the Mayor of Key West, presided over this meeting.

3. On the agenda for this meeting was a proposal that senior citizens be allowed a discount on garbage removal and sewer fees.

4. Douglas Jones attended the City Commission meeting and had listed his name as a speaker and the subject of his proposed testimony in advance of the meeting, as required by Commission rules. Jones was the only person who requested time to speak on the subject of garbage and sewer fees. He was recognized by Mayor Heyman to speak on the senior discount matter. After uttering only a few opening words, Mr. Jones' testimony was interrupted by one of the City Commissioners, Mr. Halloran, and by Mayor Heyman. Following a brief, acerbic interchange between Mayor Heyman and Mr. Jones, the Plaintiff was ordered removed and was forcibly expelled from the Commission chamber by a Key West Police Officer.

5. Key West's City Commission meetings are broadcast live on television in Key West and throughout Monroe County. Accordingly, the exchange between Mayor Heyman and Mr. Jones, as well as Mr. Jones' subsequent removal from the chamber, were seen by an unspecified number of television viewers throughout the County. Indeed, according to Mr. Jones' unrefuted testimony at trial, the videotape of the proceedings was replayed several times on television later in the evening of February 5, 1985.

6. The exchange between Mayor Heyman and Mr. Jones is memorialized in a videotape of the Commission proceedings. [See videotape, Ex. 1; verbatim transcript, Plaintiff's Ex. 2.] The relevant discussion occurred as follows:

*Mayor Heyman:* Commissioner Cates.

*Commissioner Cates:* Yes, you see in your memo here in your packet that the City Manager and I have discussed this and several uh senior citizens have brought up the fact that other utilities in Key West give discounts to senior citizens under a certain income and uh the city doesn't give any as far as garbage and sewer is concerned. Now, you see here in your information that uh we have to get permission from bond counsel before we can uh or the bond trustee, Southeast Bank, before we can approve any type of discounts for sewer, but I think that the city can uh do something as far as garbage discounts are concerned.

*Mayor Heyman:* Okay, is that ...?

*Commissioner Cates:* Well, uh, I mean uh, I would like some input from the rest of the Commission, I mean, why the city doesn't give senior citizen discounts when Florida Keys Aqueduct does, City Electric does, other utilities in the cities do as a break for senior citizens.

*Mayor Heyman:* Okay, Mr. City Manager is there any reason, uh, you say we have to get the bond counsel to give us an okay on sewer, is there any reason on the solid waste?

*City Manager Koford:* All it takes would be a change in the ordinance for solid waste for reference to your discounts and we just offset that on the other side of the ledger for whatever loss of revenues we'd receive we'd have to increase it from some place.

*Commissioner Cates:* I think the way the other utilities do it is they make them fill out a form and there's a certain limit on income, it doesn't mean that anyone with unlimited income just because they are over a certain age get a discount, but senior citizens with a limited income.

*Mayor Heyman:* Doug Jones.

*Doug Jones:* My name is Douglas Jones, I live at 1328 Duncan. Ladies and gentlemen, if you were a little more prudent with our money and the way you spend it, we could all get a discount, especially on our garbage.

*Commissioner Halloran:* Mr. Mayor—

*Mayor Heyman:* Mr. Jones—

*Mr. Jones:* I am back to the—listen, I am—

*Mayor Heyman:* (Rapped gavel.) Listen, hey, you are here to talk either for or against senior citizen discount and you stay on that.

*Mr. Jones:* Let me tell you something, Mr., I am on that subject. If you can't stay germane in your mind that's your problem, not mine.

*Mayor Heyman:* I'll decide, I'm running this meeting and I'll decide, and Mr. Jones, one more outburst like that and I'll have you removed from here.

*Mr. Jones:* I don't think you're big enough.

*Mayor Heyman:* [Rapped gavel] Mr. Officer—

*Mr. Jones:* Now, the senior citizens in this community are going to get discounts—

*Mayor Heyman:* Mr. Jones you're removed from the chambers.

*Mr. Jones:* For what reason, sir?

*Mayor Heyman:* Because you—

*Mr. Jones:* For what? Give me a—

*Mayor Heyman:* Because you did not respect this gavel and this chair.

*Mr. Jones:* I did respect this chair.

*Mayor Heyman:* No, you didn't.

*Mr. Jones:* Yes, I did.

*Mayor Heyman:* No, you didn't.

*Mr. Jones:* Oh, yes sir.

*Mayor Heyman:* Officers, please.

*Officer:* Mr. Jones, would you please leave.

*Mr. Jones:* You're going to have to forcibly take me because I'm going to sue this City.

*Mr. Jones:* (responding to officer whose voice is not audible on tape.) I'd rather not. What is the charge?

*Officer:* Mr. Jones, you're disturbing the City Commission meeting.

*Mr. Jones:* What is the charge? Have I raised my voice? I just can't believe this. These three clowns can say whatever they want and no one can talk. I cannot believe the gestapo tactics of this Commission.

*Commissioner Cates:* Mr. Mayor what about the rest of this letter where Mr. Koford says that we require the bond trustee, Southeast Bank, do we direct the City Manager to contact them in some way to see how we go about this for the sewer.

7. Mayor Heyman's testimony as to this incident was that he had ordered Mr. Jones' removal from the Commission chamber because Jones had approached the City Commission "in an antagonistic manner." Mayor Heyman further testified that his removal order was intended to "head [Mr. Jones] off at the pass" rather than risk the possibility that Mr. Jones' attitude toward the City Commission might develop into a confrontation. Further, and perhaps most importantly to our consideration, the Mayor testified that Mr. Jones' comments were irrelevant to the issue pending before the Commission. Authority for Mr. Jones' removal, according to Mayor Heyman, lay in City Ordinance No. 85–1 and in Roberts' Rules of Order.

8. City of Key West Ordinance No. 85–1 states in relevant part:

*Section 1:* It shall be unlawful for any person to disturb or interrupt any meeting of the City Commission. The use of obscene or profane language, physical violence or the threat thereof, or other loud and boisterous behavior which the presiding officer or a majority of the commission shall determine is intended as a disruption of the meeting and a failure to comply with any lawful decision or order of the presiding officer or of a majority of the City Commission shall constitute a disturbance.

\*   \*·   \*   \*   \*   \*

*Section 3:* Any person violating the provisions of this Ordinance may be ejected from the Commission Chambers or other meeting room for the duration of the meeting or for such lesser period as the presiding officer or a majority of the commission shall determine. Any decision of the presiding officer hereunder shall be subject to appeal pursuant to Robert's Rules of Order and the by-laws of the Commission.

■ 9. While we are hesitant to invalidate City Ordinance No. 85–1 as unconstitutionally vague or overbroad on its face, we do find that Mayor Heyman's invocation of this ordinance as a means of cutting short Mr. Jones' invited testimony amounted to a clear violation of Mr. Jones' First Amendment right to free expression. As a local resident with a declared interest in the senior discount issue, Mr. Jones had been given the floor during the course of the City Commission's public deliberations on this matter. The fact that Mr. Jones, in his opening comments, referred somewhat derisively to the City Commission's fiscal practices did not give Mayor Heyman or other City Commissioners any grounds for curtailing his speech or silencing his testimony. At the time that Mayor Heyman interrupted Mr. Jones' opening remarks, the latter was quite clearly laying the groundwork for a presentation focusing on the senior citizen discount issue. As the Mayor himself admitted at trial, he objected to Mr. Jones' introductory remarks as "irrelevant" and because of the "antagonistic manner" in which he felt they were being presented.

10. Once wrongfully interrupted and reprimanded for failing to focus on the senior citizen discount issue in the opening few phrases of his testimony, Mr. Jones expressed some displeasure at being so baldly rebuked by the presiding officer. Mr. Jones did say in response to the Mayor's threat of removal, "You're not big enough." The videotape unmistakably demonstrates that this sentence was muttered softly by the Plaintiff, more as an expression of disgust than in aggressive defiance. We find that this statement was not made in a threatening manner. Moreover, there was nothing menacing in either the Plaintiff's voice or his demeanor when

this statement was made. He made no moves toward the dais. This singular comment in no way threatened the order of the proceeding, or evinced an imminent threat to the physical bodily harm to Mayor Heyman, or anyone else in the chamber. Moreover, Mr. Jones' attempt to address the topic after this statement indicates to this Court that it was not in any way a challenge to the Mayor's authority, or physical safety, or otherwise meant to incite or initiate lawless action.

11. Immediately following the above-quoted colloquy, two police officers forcibly removed Mr. Jones from the Commission chamber. He was taken to a detaining room where he was handcuffed to a wall. Mr. Jones was not formally placed under arrest at that time.

12. After detaining Mr. Jones in this manner, one of the police officers returned to the Commission chamber and asked Mayor Heyman whether he intended to have Mr. Jones arrested or merely removed from the chamber. Mayor Heyman indicated that he intended only to have Mr. Jones removed from the chamber. The police officer then left the chamber and released Mr. Jones.

13. Once released, Mr. Jones approached the door to the Commission chamber. As his hand reached for the door, Police Sergeant Gary Armstrong restrained him, handcuffed him and led him back to the room where he had been previously held.

14. Following his second handcuffing, Mr. Jones was held for approximately thirty minutes and was then released. He was charged with violating Key West Ordinance No. 85–1.

15. The charge against Mr. Jones was brought to trial in the county court in and for Monroe County. Following this proceeding, Mr. Jones was found not guilty of violating City Ordinance No. 85–1.

16. Given the absence of any genuine risk of a disturbance which would jeopardize the City Commission's ability to proceed with its deliberations on the senior discount issue, we find that Mayor Heyman's actions in interrupting Mr. Jones' presentation, chastising him for his "outbursts," and then having him forcibly removed from the Commission chamber were clearly not authorized by City Ordinance No. 85–1. Moreover, we find that a reasonable person in Mayor Heyman's position could not have believed that Mr. Jones' speech or conduct posed any real threat of disruption, such that his removal from the chamber would have been justified under the applicable city ordinance.

■ 17. Mr. Jones claims that the extensive publicity surrounding his removal from the City Commission chamber, including the televised broadcasts of the events leading up to his expulsion, subjected him and his wife to ridicule and adversely affected his fumigation business. He acknowledged that the losses to his business were difficult to quantify, but he estimated that they amounted to as much as $30,000. We find this estimate, unrefuted by the Defendants, to be a reasonable basis for an award of compensatory damages to Plaintiff with respect to the adverse impact of publicity surrounding the events of February 5, 1985.

■ 18. Plaintiff additionally seeks recovery of the expenses which he incurred in defending himself against the charge of violating City Ordinance No. 85–1 in the county court. In light of our conclusion that his removal from the Commission chamber, his subsequent arrest, and his prosecution under City Ordinance No. 85–1 were wholly without foundation, we find that Plaintiff is entitled to the full recovery of all costs associated with his defense against the criminal charge brought against him. Plaintiff's uncontested assertion is that the costs associated with that proceeding amounted to $1,500.00.

19. The language which Mr. Jones chose to express his concern about the Key West City Commission's fiscal policies may not have been as moderated or deferential as Mayor Heyman or other City Commissioners would have liked. There was nothing in his speech or conduct, however, which was so grossly offensive or inflammatory as to threaten the disruption of the

City Commission meeting. To the contrary, his statements were precisely of the sort which the Supreme Court has consistently sought to protect as within the realm of acceptable debate on matters of public concern. He began his presentation with a caustic comment on what he apparently regarded as the City's misallocation of public funds: "Ladies and gentlemen, if you were a little more prudent with our money and the way you spend it, we could all get a discount, especially on our garbage." This remark may well have been offensive to Mayor Heyman and his colleagues, but such "offensive" or "vituperative speech" is clearly and unequivocally protected by the First and Fourteenth Amendments, most particularly when it occurs in the context of public debate on matters of political or social concern. Viewed in this context, Mayor Heyman's attempt to cut off Mr. Jones' speech and to soften its tone by threatening to have Mr. Jones removed from the chamber was a clear infringement on Mr. Jones' constitutionally protected right to free expression. This infringement manifested itself even more egregiously in Mayor Heyman's actual order that Mr. Jones be removed from the room before the latter had been given even the briefest opportunity to proceed with his public testimony. We note again that Mr. Jones was not an uninvited intruder upon the City Commission's proceedings. To the contrary, he was a scheduled speaker on the City Commission's meeting agenda for the date in question. Accordingly, for the reasons stated at length, we find that the Defendant violated Plaintiff's First Amendment rights.

## II. CONCLUSIONS OF LAW

1. We are convinced that Douglas Jones was silenced at the City Commission hearing solely because of the content of his remarks. The contention that he was ousted because of his threats of physical harm and disruptive manner is spurious. In fact, Defendant Heyman testified at trial that he believed that the Plaintiff had "a bad attitude," and was "disrespectful." Silence coerced by law upon such a rationale is precisely what the First Amendment forbids.

The exact contours of the protections afforded various categories of speech by the First Amendment have been widely debated. There has been disagreement among jurists and scholars as to both the theoretical basis of First Amendment protections, as well as the "type" of speech embraced by its command. However, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed. 2d 484 (1966); *see also Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931); *cf.* Stephan, *The First Amendment and Content Discrimination*, 68 Va. L.Rev. 203, 207, 209 (1982); *see generally* Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind.L.J. 1 (1971). Underlying the unique position of political speech is its central importance to the functioning of "representative democracy, 'a form of government that would be meaningless without freedom to discuss government and its policies.'" BeVier, *The First Amendment and Political Speech: An Inquiry Into the Substance and Limits of Principle*, 30 Stan.L.Rev. 299, 308 (1978) (*quoting* Bork, *supra*, at 23); *see generally* Meiklejohn, *Free Speech and Its Relation to Self–Government* (1948); Brennan, *The Supreme Court and The Meiklejohn Interpretation of the First Amendment*, 79 Harv.L.Rev. 1 (1965); *but see* Tribe, *American Constitutional Law* § 12–8, at 834–35 & n. 8 (2d ed. 1988). The ability of the body politic to speak on matters of public importance is fundamental to our system of self-government, and "[c]ommentators have never seriously questioned [the] basic conclusion

that the constitutional process of self-government provides an indispensible clue to the meaning of the First Amendment." BeVier, *supra*, at 309.

The Plaintiff, in this case, was silenced under these precise circumstances against which the First Amendment was designed to protect. The Key West Commission hearing was based, in both function and form, on the purest form of self-government: the town hall meeting.

> A key feature of the town meeting is that there are no government officials in the sense of political leaders; there is only a moderator whose sole function is to organize the meeting and enforce rules of order. Members of the population propose ideas, debate those ideas, and then adopt or reject them by a vote of all the people.... [T]he essential feature of the town meeting is the open debate and public deliberations that precede any decision....

Schauer, *Free Speech: A Philosophical Enquiry* 38 (1982). Having fully complied with the requirements for access to the forum, Mr. Jones meant to speak on a matter of public import and was denied his right to speak and participate in the most fundamental aspect of democratic decision making. Mayor Heyman exercised power which exceeded the limits given to any public official presiding over a public meeting. We have found that the Mayor's action was based solely on the content of Mr. Jones' speech and not his demeanor. It is beyond dispute that the mandate of the First Amendment prohibits a governmental body from silencing its critics because of the content of the speech or the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969). Our polity envisions heartier public officials who embrace a tradition of healthy suspicion by their constituants.

2. The Supreme Court has been outspoken in its protection of free expression on matters of political and social concern:

The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed. 2d 1498 (1957). "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941), and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." *N.A. A.C.P. v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405.

*New York Times Co.,* 376 U.S. at 269, 84 S.Ct. at 720. In that opinion, the Court referred to "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. at 721 (citation omitted). Even where certain profanities uttered by an individual could not be viewed as valuable to the public at large, the Eleventh Circuit has held that "the first amendment's protections do not turn on the social worth of the statements...." *Waters v. Chaffin,* 684 F.2d 833, 837 (11th Cir.1982) (citations omitted). *See also, N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 911 n. 46, 102 S.Ct. 3409, 3424 n. 46, 73 L.Ed.2d 1215 (1982) (*quoting Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (citation omitted)) ("The lan-

guage of the political arena ... is often vituperative, abusive, and inexact.").

3. In the case at bar, the City Commission meeting took place in a chamber that had been specifically designated for use that evening to provide a forum for testimony on issues of public importance. The chamber itself is not always open to the public, and unlike streets and parks, *see Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (*citing Hague v. Committee For Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)), became a forum for the purpose of public assembly and debate only through its designation by the government. However, "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create that forum in the first place." *Id.* (citations omitted). The City of Key West was not constitutionally required to hold an open meeting on the senior citizen discount matter. *See City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 178, 97 S.Ct. 421, 428, 50 L.Ed.2d 376 (1976) (Brennan, J. concurring) (*citing Bi–Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915)). However, once it created the public forum the City was "bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Education Association*, 460 U.S. at 46, 103 S.Ct. at 955 (citation omitted).

4. Time, place and manner restrictions were placed on the conduct of this meeting. Plaintiff fully complied with the prerequisites so that he would be heard, and his conduct did not threaten the orderly conduct of this meeting. The restrictions placed on Plaintiff's speech were content based, *cf., Wright v. Anthony*, 733 F.2d 575 (8th Cir.1984) (reasonable restriction placed on speaker, when notice given before the meeting that presentation would be limited to five minutes), arbitrary, and without any nexus to a legitimate governmental interest. Early in the confrontation, and before any allegedly threatening words were uttered, Mayor Heyman stated: "I'll decide [what is germane to the discussion]. I'm running this meeting and I'll decide...." However, we believe that once a political discussion is open, in a public forum, the chairperson simply does not retain the power to impose by fiat content-based restrictions, which reflect only his personal view, or to coerce silence. As stated by the Supreme Court,

> above all else, the First Amendment means the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship. The essence of this forbidden censorship is content control.... [The] government may not grant the use of a forum to people whose view it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities.

*Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972) (citations omitted).

5. The proposition that content based restrictions may not be imposed in public forum speech was illustrated in *City of Madison, supra*. Although that case arose in a factually distinct context, it is nonetheless instructive. There, the Wisconsin Employment Relations Commission ordered that the School Board " 'immediately cease and desist from permitting employes other than representatives of [the teachers' majority collective bargaining representative] to appear and speak at meetings of the Board of Education, on matters subject to collective bargaining....' " *Id.* 429 U.S. at 173, 97 S.Ct. at 425. This decision was upheld by the Wisconsin Supreme Court "in order 'to avoid the dangers attendant

upon relative chaos in labor management relations.'" *Id.* (*quoting City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 69 Wis.2d 200, 212, 231 NW.2d 206, 213 (1975)).

The Supreme Court reversed, finding specifically that teachers could not be prevented from speaking at a public meeting on a subject which concerned them both as employees and citizens. The Court went on to note that

> the participation in public discussion of public business cannot be confined to one category of interested individuals. To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees.... [W]hen the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of ... the content of their speech.

*Id.* 429 U.S. at 175–76, 97 S.Ct. at 426–27 (*citing Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290) (footnotes omitted).

6. It is essential to distinguish Mr. Jones' comments from the sorts of speech which have been deemed sufficiently provocative to fall outside the protections of the First Amendment. In *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) the Supreme Court upheld the conviction of an individual who called a local law enforcement officer "a God damned racketeer," and "a damned Fascist." *Id.* at 569, 62 S.Ct. at 768. The Court, in so holding, "singled out certain categories of speech as not representing 'speech' within the meaning of the first amendment because they are 'no essential part of any exposition of ideas,' and because their 'very utterance inflict injury or tend to incite an immediate breach of the peace.'" Tribe, *supra,* § 12–8, at 837 (*quoting Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769). The Court reasoned that provocative language directed in obvious hostility toward an individual who might reasonably be motivated to violence by such language is not to be afforded First Amendment protection.

The Supreme Court, however, has, since *Chaplinsky,* altered its approach to the fighting words doctrine. The relevant inquiry now is an examination of both the context in which the words are spoken, Tribe, *supra,* § 12–10, at 851 & n. 6, as well as the "imminent threat of unlawful action by the *actual* addressee, rather than ... the *average* addressee." Note, *The Fighting Words Doctrine—Is There a Clear and Present Danger to the Standard?,* 84 Dick.L.Rev. 75, 86 (1979) (emphasis in the original); *but see* Gard, *Fighting Words or Free Speech,* 58 Wash.U.L.Q. 531, 555–58 (1980) (arguing that an objective test remains operative). Accordingly, we analyze Mr. Jones' "challenge" to Mayor Heyman not only by acknowledging the literal meaning of his statement, but also by examining the manner and context in which it was spoken.

This contextual approach perhaps is best illustrated in *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). In that case, an individual was convicted for disturbing the peace by wearing, in a Los Angeles courtroom, a jacket which bore the words "Fuck the Draft." The Supreme Court overturned the conviction which "'[a]t most reflect[ed] an 'undifferentiated fear or apprehension of disturbance....'" *Id.* at 23, 91 S.Ct. at 1787 (*quoting Tinker,* 393 U.S. at 508, 89 S.Ct. at 737). The Court held that the "fighting words" doctrine did not remove Cohen's speech from the ambit of First Amendment protections. Significantly, the Court noted that while the language may have been "provocative," it was not directed to a particular person. *Id.* at 20, 91 S.Ct. at 1785. Nor were there present "substantial numbers of citizens ... standing ready to strike out physically at whoever may assault their sensibilities...." *Id.* at 23, 91 S.Ct. at 1787. Moreover, Cohen's jacket was not worn to provoke a hostile reaction by its "audience." Finally, no person that saw the jacket actually was aroused to violence. These considerations as well as the Court's recognition that "it is ... often true that one man's vulgarity is another's lyric[,]"

*id.* at 25, 91 S.Ct. at 1788, forcefully demonstrates that all of the circumstances surrounding the particular utterance must be considered before stripping it of Constitutional protection.

The question of whether Mr. Jones' language was likely to produce a violent reaction also can be analyzed by reviewing *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam). Although that case did not arise because of the utterance of "fighting words" but rather in the context of the violation of a statute prohibiting subversive advocacy, it is nevertheless instructive. In *Brandenburg,* the Court held that the First Amendment forbids the proscription of advocacy urging the violation of law or the use of force unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829 (footnote omitted). This standard requires an examination of the context of the speech and the existence of an actual threat or incitement.

> This content-focused inquiry is analogous to the personally abusive epithet requirement of the fighting words doctrine. Both attempt to afford maximum constitutional protection to expressive activities by insulating speech from governmental sanctions unless its content constitutes "triggers to action" or "inherently inflammatory" remarks.

Gard, *supra,* at 539 (*quoting in seriatum Masses Publishing Co. v. Patten,* 244 F. 535, 540 (S.D.N.Y.1917); *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365–66, 22 L.Ed.2d 572 (1969)).

■ In this case, Mr. Jones did not have any reason to suspect that his opening remarks before the City Commission would provoke an argumentative response from the Mayor or any other member of the City Commission. Even his comment, after being threatened by the Mayor with expulsion, that the Mayor wasn't "big enough" to have him removed from the chamber, was not likely to trigger violence. As the videotape of the proceeding reveals, Mr. Jones muttered this retort in a half-whisper

and not in a defiant shout. The comment, we also note, was made in understandable exasperation at the Mayor's hostility toward his anticipated testimony. The lack of genuine provocation in Mr. Jones' comment is yet further evidenced by the fact that, immediately after making the comment, he attempted to resume his testimony. He then stated: "Now, the senior citizens in this community are going to get discounts—." The development of this comment was interrupted by the Mayor's announced order that Mr. Jones was to be removed from the chamber.

Viewing the confrontation in its entirety, it is clear that Mr. Jones' statement "You're not big enough," was neither disruptive nor meant to provoke a violent reaction. While it may be viewed as an unfortunate aside, it did not strip away the constitutional protections of what was clearly political speech. Moreover, there was no real possibility that this one comment would cause a violent reaction by anyone. Finally, and perhaps most importantly, we have come to expect from our public officials the resilience to withstand criticism which may often be directed in offensive terms. *Cf. Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, J., concurring) (properly trained police officer expected to exercise "higher degree of restraint" than the average citizen). Accordingly, we find that Mayor Heyman did not properly silence Mr. Jones because of his "provocation" or "disruptive" language.

7. While we have found that the Key West Ordinance 85–1 was unconstitutionally applied to the Plaintiff in this case, we now turn to consider whether the ordinance is unconstitutional under all circumstances. Plaintiff seeks a declaration that the Key West City Ordinance No. 85–1 is facially invalid and an injunction barring its enforcement, contending that the ordinance "places an impermissible and undue burden on free speech in violation of the First Amendment of the Constitution ... in that it unreasonably limits the content of public speech at City Commission meetings." [Complaint at ¶ 13(c).] Plaintiff further maintains that the ordinance is unconstitu-

tionally vague and overbroad, lacking "precise, objective, and narrowly pinpointed standards controlling the presiding officer's or a majority of the City Commissioners' exercise of discretion in their determination as to what speech shall constitute a disturbance." [*Id.* at ¶ 13(c).] As a result of these alleged flaws in the ordinance, Plaintiff asserts that the ordinance violates the due process and equal protection clauses of the Constitution. [*Id.* at ¶ 14.]

■ Upon a careful examination of City Ordinance No. 85–1 we are unable to conclude that the ordinance, as drafted, is either so overbroad or so vague in its provisions as to be rendered facially violative of the First and Fourteenth Amendments. Moreover, the content regulation that occurred in this case was a function of the improper conduct of the presiding officer and not the operation of the Ordinance.

■ 8. We turn first to Plaintiff's overbreadth argument.

Under the First Amendment overbreadth doctrine, an individul whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid."

*Board of Airport Commissioners of Los Angeles v. Jews For Jesus, Inc.,* —— U.S. ——, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500 (1987) (*quoting Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985)). We note at the outset that "[o]nly a statute that is substantially overbroad may be invalidated on its face." *City of Houston v. Hill,* —— U.S. ——, 107 S.Ct. 2502, 2508, 96

L.Ed.2d 398 (1987) (*citing New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 113 (1982); *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); *see also Jews for Jesus, Inc.,* 107 S.Ct. at 2571 (citations omitted). The court's focus in this inquiry is not whether a single impermissible application of a statute may be construed, but whether the statute proscribes a " 'substantial amount of constitutionally protected conduct.' " *Hill,* 107 S.Ct. at 2508 (*quoting Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)) (other citations omitted). The Supreme Court has demonstrated a reluctance to strike down a statute, based upon overbreadth, when it may have some permissable application.[2] *See, e.g., Ferber,* 458 U.S. at 769, 102 S.Ct. at 3361; *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563–64, 41 L.Ed.2d 439 (1974).

9. The Key West ordinance specifically prohibits: the use of obscene or profane language; physical violence or the threat thereof; and disruptive behavior. As we have found, this ordinance was applied so that protected speech was quashed. The overbreadth analysis requires us to further determine whether the statute, on its face, prohibits other constitutionally protected speech. Parliamentary bodies such as the Key West City Commission are certainly entitled to establish time, place and manner restrictions which enable them to carry out their responsibilities with order and efficiency. In a number of contexts, such content-neutral regulations as to speech or conduct have been upheld where the restrictions were intended to advance legitimate governmental objectives. *See e.g., City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29

---

**2.** The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted. Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is "strong medicine"

and have employed it with hesitation, and then "only as a last resort."
*New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (*quoting Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)); *see also Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.,* —— U.S. ——, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (citations omitted).

(1986) (city ordinance which provided that adult theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school upheld as designed to serve a substantial governmental interest and provided adequate alternative avenues for communication); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (National Park Service regulation which prohibited overnight camping in certain parks valid as a time, place and manner restriction); *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (city ordinance prohibiting the posting of signs on public property upheld in light of the city's asserted interest in preventing visual clutter); *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (upholding constitutionality of fairground regulation requiring that individuals, groups, or firms desiring to distribute materials at state agricultural fair do so only from fixed locations; regulation sufficiently related to legitimate governmental interest in crowd management and safety); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (anti-noise ordinance, barring willful noisemaking or other activity adjacent to school which disturbs or tends to disturb the peace or good order within the school, deemed constitutional); *Harnish v. Manatee County, Florida,* 783 F.2d 1535 (11th Cir.1986) (legitimate governmental interest in aesthetics renders constitutional a county ordinance prohibiting the erection or display of all temporary signs).

■ A statute or ordinance can, however, be struck for overbreadth if it is so sweeping as to prohibit speech or conduct and its provisions are unrelated to any legitimate governmental objective. The Supreme Court recently struck down a Texas ordinance which made it " 'unlawful for any person to ... in any manner oppose, molest, abuse, or interrupt any policeman in the execution of his duty,' and thereby prohibits verbal interruptions of police officers." *Hill,* 107 S.Ct. at 2509 (quoting

Houston Municipal Code § 34–11(a) (1984)) (footnote omitted). The Court found that this ordinance "criminalizes a substantial amount of constitutionally protected speech," *id.* at 2512, and was "not narrowly tailored to prohibit only disorderly conduct or fighting words...." *Id.* at 2511 (footnote omitted).

The Key West ordinance, while certainly not a model of draftsmanship, does specifically identify what type of speech may be deemed violative. It is important to note that while the discretion given the Commission and the presiding officer is quite broad, the power granted may be properly exercised only with regard to the specific type of speech which is embodied in the ordinance. The prohibition of obscene or profane speech will not potentially silence constitutionally protected speech. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Nor will the prohibition of threats. *Chaplinsky, supra; see also Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972) ("the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.") Moreover, the prohibition against loud and boisterous behavior, to the extent that such behavior is intended to disrupt a City Commission meeting, is not overbroad because that limitation is consonant with permitted time, place and manner restrictions. Clearly, there are "a substantial number of situations to which [the ordinance's prohibitions] might be validly applied." *Parker,* 417 U.S. at 760, 94 S.Ct. at 2563. We are convinced that any constitutional violations would result from the improper application of this ordinance, and not the prohibitions contained in the ordinance itself.

10. As to Plaintiff's contention that City Ordinance No. 85–1 is unconstitutionally vague, we similarly find the ordinance—though certainly imprecise—to be within the bounds of what the Supreme Court has deemed constitutionally permissible. "[T]he void-for-vagueness doctrine requires that a penal statute define the ... offense with sufficient definiteness that ordinary

people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed. 2d 903 (1983) (citations omitted). The statute must provide fair notice of what conduct is prohibited. "[I]n the first amendment area, the objectionable aspects of vagueness need not depend on fair notice, for the first amendment's demand for specificity is also a product of the concern for a statute's chilling effect." Tribe, *supra,* § 12–31, at 1034. Therefore, while some degree of predictability and precision must be present in statutory restrictions on expression or conduct, we recognize that the statutory language must be "general enough to take into account a variety of human conduct...." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). Yet language which is too general inhibits speech because those sensitive to the indefinite language avoid the risk of violation "only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964) (citations and footnote omitted); *see also Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (void-for-vagueness doctrine demands greater specificity in First Amendment context).

The disputed Key West ordinance is disturbingly vague in certain important respects. Under its provisions, the ordinance fails to define how serious, lengthy, or dramatic a person's conduct would have to be to constitute a "disruption" of a City Commission meeting. As a result, broad— and perhaps excessive—discretion lies with the Mayor and the City Commissioners in determining the outer bounds of acceptable conduct within the Commission chamber.[3] Moreover, while the ordinance makes it unlawful not only to "disturb" but also to "interrupt" a City Commission meeting, this latter term is nowhere defined in the ordinance.

Despite these obvious flaws in the ordinance, we take careful heed of the Supreme Court's admonition in *Colten,* and decline to declare the ordinance void for vagueness. While the ordinance's authors may have achieved considerably less than an optimal balancing of the factors set forth in *Colten,*[4] we do not find the ordinance so vague on its face as to deprive the public of fair warning that certain kinds of conduct are prohibited. Moreover, surely there is a certain efficacy in granting the Commission some latitude in determining the appropriate decorum which must be observed at their meetings. It is clear, however, that the First Amendment provides an obvious boundary for the exercise of this discretion. Accordingly, we decline to declare the ordinance, or portions thereof, void for vagueness.

■ 11. It is clear that the City of Key West may be held liable for the deprivation of Plaintiff's First Amendment rights. Under *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "[l]ocal governing bodies ... can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035. Here there can be no doubt that Mayor

---

3. *See City of Houston v. Hill,* —— U.S. ——, 107 S.Ct. 2502, 2511 n. 15, 96 L.Ed.2d 398 (1987) (collecting cases where statutes found unconstitutional because of the excessive scope of discretion allotted to the enforcement officials). On this point, the Court, *id.,* quoted Justice Douglas dissenting in *Younger v. Harris,* 401 U.S. 37, 65, 91 S.Ct. 746, 764, 27 L.Ed.2d 669 (1971): "The eternal temptation, of course, has been to arrest the speaker rather than to correct the conditions about which he complains."

4. "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

Heyman's conduct in silencing the Plaintiff was taken pursuant to Key West's Ordinance 85–1.

12. Defendant Heyman has argued that, even if his actions violated Mr. Jones' First Amendment rights, the Mayor should not be held liable for any damages resulting from this infringement because he enjoys qualified immunity as a government official. We squarely reject this defense as not supported by the facts of the case. Under the applicable standard set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted). Personal liability "for an allegedly unlawful official action generally turns on the 'objective legal reasonableness of the action,' [*id.,*] at 819, 102 S.Ct., at 2739, assessed in light of the legal rules that were 'clearly established' at the time it was taken, *id.* at 818, 102 S.Ct., at 2738." *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). As the Supreme Court recently articulated, in order for official conduct to violate a "clearly established" right,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth*, 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985) ]; but it is to say that in the light of preexisting law the lawfulness must be apparent.

*Anderson*, 107 S.Ct. at 3039 (citations omitted).

Applying this standard to the present case requires us to find whether a reasonable person could have believed that Mayor Heyman's conduct in silencing and forcibly removing Mr. Jones was lawful in light of the circumstances surrounding that incident and clearly established First Amendment jurisprudence. Mayor Heyman's subjective beliefs are largely irrelevant to this inquiry. *See Id.* at 3040.

A recent decision by the Second Circuit Court of Appeals is instructive. In *Musso v. Hourigan*, 836 F.2d 736 (2d Cir.1988), the court examined the application of *Harlow* to a purported violation of First Amendment rights. There, the plaintiff attended a public school board meeting being held to determine whether the acting chairman of the board "should be permitted to serve out the remainder of the outgoing chairman's term...." *Id.* at 738. During the debate, the plaintiff rose from his seat and stated his views as to the resolution of a prolonged procedural dispute. One defendant shouted him down, ordered him quiet, and eventually called the police to have him removed from the premises. The plaintiff filed a § 1983 action based upon, *inter alia*, the deprivation of his First Amendment rights. The district court denied defendants' motion for summary judgment based on qualified immunity. The Second Circuit heard an interlocutory appeal of that order.

The court began its discussion by noting the general proposition that the First Amendment prohibits content regulation of speech. *Id.* at 742 (*citing Mosley*, 408 U.S. at 95–96, 92 S.Ct. at 2289–90; *Heffron*, 452 U.S. at 647–48, 101 S.Ct. at 2563–64). Crucial to the application of *Harlow* under those circumstances were the questions of whether the defendant silenced the plaintiff because he disagreed with the content of the plaintiff's speech; and if so whether such conduct violated clearly established First Amendment law. The court concluded that the first consideration was a question for the trier of fact, and if it was found that the defendant did impose a content-based restriction, "such conduct unambiguously violated clearly established first amendment law." *Id.* at 743.

As the trier of fact in this case, we have found that the Defendant Heyman silenced Douglas Jones exactly because of the content of his speech. A public "official is

charged with such knowledge if the appropriate legal standard is, by objective standards, clearly established at the time the official undertook the activity at issue." *Id.* at 743. On the date of the incident, here, February 5, 1985, there can be no question but that content-based censorship by a state official acting in his official capacity flatly violated the most basic First Amendment protections. Defendant Heyman is not entitled to qualified immunity.

13. Under § 1983, the level of damages a plaintiff may recover for violations of its provisions "is ordinarily determined according to principles derived from the common law of torts.... [C]ompensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2542, 2543, 91 L.Ed.2d 249 (1986) (citations omitted). Here, Plaintiff seeks to recover damages suffered because of the "embarrassment, public humiliation, emotional distress, mental pain and suffering, and injury to his reputation," [Complaint ¶ 20], caused by this incident. We note that such injuries are often quite difficult to quantify.

Plaintiff has submitted unrebutted evidence that he incurred costs of $1,500.00 in successfully defending his criminal prosecution under this ordinance. The Plaintiff further testified that although it was "hard to tell" how this incident affected his business, he estimated that it was "off by about $30,000.00." This testimony went unchallenged by the Defendants.

The more difficult question arises in determining: first, whether the Plaintiff suffered emotional and mental injury; and second, the valuation of any such injury. Damages for mental and emotional distress are recoverable under § 1983. *See id.; Carey v. Piphus,* 435 U.S. 247, 263–64 & n. 20, 98 S.Ct. 1042, 1052–53 & n. 20, 55 L.Ed.2d 252 (1978). Of course, there must be satisfactory proof that the injury actually occurred, *Memphis Community School District,* 106 S.Ct. at 2543–44; *Carey,* 435 U.S. at 264, 98 S.Ct. at 1053, "although

there need be no evidence which assigns an actual dollar value to the injury." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *see also Carey,* 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20 (referring to the *Gertz* standard). The holdings in *Memphis School District* and *Carey* indicate that "it is the *injury,* not a precise measure of damages, that must be clearly established in the record before a plaintiff may recover any damages." *Spence v. Board of Education of Christina School District,* 806 F.2d 1198, 1203 (3d Cir.1986) (Higginbotham, J., concurring) (emphasis in the original).

In proving injury in a § 1983 action the Eleventh Circuit Court of Appeals "has held that damages for emotional distress ... 'may be inferred from the circumstances as well as proved by the testimony.'" *Marable v. Walker,* 704 F.2d 1219, 1220 (11th Cir.1983) (*quoting Gore v. Turner,* 563 F.2d 159, 164 (5th Cir.1977)) (other citation omitted); *see also H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1088 (11th Cir. 1986) (injury of mental and emotional distress may be inferred from the evidence of the violation); *Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985) (same). Even though the plaintiff offered no direct evidence of psychiatric disturbances, physical symptoms, or effect on social activity, these criteria "may go more to the amount, rather than the fact, of damage." *Marable,* 704 F.2d at 1220. Here, in a nutshell, the evidence indicates that during a public meeting, broadcast live on television throughout Monroe County, and replayed on the evening news, the Plaintiff was silenced in a public forum, forcibly removed from the chamber, handcuffed, arrested and then prosecuted. While the mental and emotional consequences of such occurrences on particular individuals will undoubtedly vary, we find that from these circumstances it may be reasonably inferred that the Plaintiff actually did suffer humiliation, emotional distress, and embarrassment. The Plaintiff submitted no evidence that supported his claims for injury to his reputation or mental pain and suffering, and these elements of damage are quite susceptible to measures of extrinsic proof.

14. The emotional injury that was suffered by the Plaintiff is not easily quantified. The Eleventh Circuit Court of Appeals has declined to "adopt a specific formula for the calculation of actual [emotional] injury," *H.C. by Hewett*, 786 F.2d at 1089, and has noted that "[o]nce liability has been found, the district court has a great deal of discretion in deciding the level of damages to be awarded." *Stallworth*, 777 F.2d at 1435 (upholding $100,000.00 compensatory award for violations of §§ 1981 and 1983). Moreover, we are mindful that this Court is constrained from compensating the Plaintiff for the loss of the "abstract 'value' of his due process and First Amendment rights." *Memphis Community School District*, 106 S.Ct. at 2546.

The extent of the evidence submitted was the Plaintiff's unrebutted testimony. Mr. Jones testified that his business was off by almost $30,000.00 as a result of this incident. He offered no other evidence which corroborated this claim. While we specifically credit this testimony as reliable, we are reluctant to accept this figure at face value when it could have been supported by other evidence. We find, however, that Mr. Jones' testimony accurately reflects the value of his out-of-pocket business losses, as well as the emotional injury that he suffered because of this incident. We also find that the Plaintiff is entitled to recover the $1,500.00 costs incurred in defending the criminal action. Accordingly, the Plaintiff is entitled to $31,500.00 in compensatory damages.

15. In an Order entered January 22, 1986, this Court dismissed Plaintiff's claim for punitive damages against the Defendant, City of Key West. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Therefore, we are left only to consider the question of punitive damages against Defendant Heyman.

16. In *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court established the standard under which punitive damages may be imposed upon an individual defendant in a § 1983 action. The Court stated that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. We find that Defendant Heyman's actions crossed that threshhold and punitive damages are appropriate.

In *H.C. by Hewett, supra,* the Eleventh Circuit implied that a finding by the district court that the defendant was not entitled to qualified immunity under *Harlow, supra,* was a virtually *per se* indication that the defendant's conduct satisfied the *Smith* standard for punitive damages. *H.C. by Hewett*, 786 F.2d at 1089; *see also Washington v. Kirksey*, 811 F.2d 561, 564–65 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 96, 98 L.Ed.2d 56 (1987).

In the present case, we have already concluded that Heyman violated a "clearly established ... constitutional right[ ] of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. While the evidence suggests that this Defendant's conduct may actually have been based upon an evil motive, we need not reach that conclusion in order to find that punitive damages are appropriate. It is clear that this Defendant evinced callous indifference to the Plaintiff's First Amendment rights. There can be no tenable suggestion that Mayor Heyman's conduct was merely negligent or inadvertant. He intentionally silenced a vocal critic in a public forum.

The purpose of punitive damages is to punish outrageous conduct and deter similar conduct in the future. "The focus is on the character of the tortfeasor's conduct—whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.... [S]ociety has an interest in deterring and punishing *all* intentional and reckless invasions of the rights of others...." *Smith*, 461 U.S. at 54, 103 S.Ct. at 1639 (emphasis in the original). Nowhere is that interest clearer than where a public official has willfully silenced robust public debate in a public forum. In determining what amount of punitive damages will serve this purpose, we observe that there can be no

neat formula by which the appropriate sum can be ascertained. An award of punitive damage that equals the amount of compensatory damage, we believe, sufficiently punishes the Defendant and effectively serves notice to the defendant, and others, that violations of the First Amendment can have severe economic consequences. Punitive damages in the amount of $31,500.00 is consistent with other recent punitive damage awards which were based, at least in part, on violations of the Plaintiff's First Amendment rights. *See, e.g., Rakovich v. Wade,* 819 F.2d 1393, 1399–1400 (7th Cir. 1987) (punitive award of $90,000.00 excessive where Circuit Court of Appeals found that compensatory award of $50,00.00 was excessive because, based on the evidence adduced at trial, the plaintiff was entitled only to nominal damages); *Wren v. Spurlock,* 798 F.2d 1313, 1322–23 (10th Cir.1986) (jury award of $7,500.00 in punitive damages and $113,000.00 in compensatory damages upheld as not excessive), *cert. denied,* —— U.S. ——, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987); *Fishman v. Clancy,* 763 F.2d 485, 489–90 (1st Cir.1985) (award of $65,-000.00 in punitive damages and $10,000.00 in compensatory damages upheld); *Kemp v. Ervin,* 651 F.Supp. 495, 506–09 (N.D.Ga. 1986) ($400,000.00 award in punitive damages was equivalent of double the award for mental anguish); *Wulf v. City of Wichita,* 644 F.Supp. 1211, 1226–27 (D.Kan. 1986) ($50,000.00 in punitive damages and $250,000.00 awarded for mental anguish, $242,465.95 for back pay, and $389,806.42 for front pay); *Kercado Melendez v. Aponte Roque,* 641 F.Supp. 1326, 1338 (D.P.R.1986) ($10,000.00 in punitive damages, $15,000 for emotional distress, as well as back-pay award), *aff'd,* 829 F.2d 255 (1st Cir.1987); *Boyd v. Board of Directors of McGehee School District No. 17,* 612 F.Supp. 86, 94 (E.D.Ark.1985) ($1,000.00 in punitive damages and $250.00 in nominal damages).

17. Finally, under 42 U.S.C. § 1988, the district court should allow the prevailing plaintiff in a § 1983 action reasonable attorney fees and costs absent special circumstances " 'which would render such an award unjust.' " *Kentucky v. Graham,* 473 U.S. 159, 164, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985) (*quoting* S.Rep. No. 94–1011, p. 4 (1976)) (other citation omitted). *See also Smith v. Robinson,* 468 U.S. 992, 1006, 104 S.Ct. 3457, 3465, 82 L.Ed.2d 746 (1984); *Popham v. City of Kennesaw,* 820 F.2d 1570, 1578 (11th Cir.1987); *Dowdell v. City of Apopka, Florida,* 698 F.2d 1181, 1189 (11th Cir.1983). We find that there exist no special circumstances, *see Martin v. Heckler,* 773 F.2d 1145, 1149–51 (11th Cir.1985), which would militate against fully awarding the Plaintiff, as the prevailing party in this case, attorney's fees and costs. Moreover, both the Defendant Heyman and the City of Key West are liable pursuant to § 1988, as "fee liability runs with merits liability...." *Kentucky,* 473 U.S. at 168, 105 S.Ct. at 3107. Accordingly, it is

ORDERED AND ADJUDGED that the Defendants are liable to the Plaintiff in the amount of $31,500.00 and reasonable attorney's fees and costs. Plaintiff is directed to submit within ten (10) days, affidavits which address the question of costs and attorney fees. Defendants shall have ten (10) days thereafter in which to respond to these affidavits. It is further

ORDERED AND ADJUDGED that Defendant Heyman is liable to the Plaintiff for punitive damages in the amount of $31,-500.00.